**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| **v.** | ) | **I.D. No. 1207010738** |
| | ) | |
| **JASON SLAUGHTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

*Upon Consideration of Defendant's Motion for Postconviction Relief*
***DENIED***

*Date Submitted: November 20, 2020*
*Date Decided: February 16, 2021*

Carolyn Hake, Esquire, and Phillip Casale, Esquire, Department of Justice, Wilmington, Delaware. *Attorney for the State*.

Christopher S. Koyste, Esquire, Law Offices of Christopher S. Koyste LLC, Wilmington, Delaware. *Attorney for Jason Slaughter*.

**DAVIS, J.**

## I.     INTRODUCTION

This is a criminal case after acceptance of a guilty plea and sentencing. Jason Slaughter pled guilty to Murder Second Degree. After a hearing, the Court accepted the guilty plea. The Court then sentenced after ordering a pre-sentence investigation and a hearing. Before the Court is the Defendant's Amended Motion for Postconviction Relief (the "Motion").

Mr. Slaughter filed a *pro se* motion for postconviction relief and appointment of counsel on September 25, 2017. The Court appointed counsel to represent Mr. Slaughter in his Criminal Rule 61 proceedings. The Motion was filed on May 14, 2019. The Motion is supported by five volumes of supporting exhibits. In addition, trial counsel filed affidavits on October 24, 2019 and December 11, 2019.[1] The State filed its State's Response to Defendant's Amended Motion

---

[1] Aff. of Patrick J. Collins ("Collins Aff.") and Affidavit of Natalie Woloshin, Esquire ("Woloshin Aff.").

for Postconviction Relief (the "Response") on February 12, 2020. Mr. Slaughter's counsel filed Petitioner Jason Slaughter's Reply to State's Response to Amended Motion for Postconviction Relief (the "Reply") on May 1, 2020.

On November 20, 2020, the Court held a hearing (the "Hearing") on the Motion. At the conclusion of the Hearing, the Court took the Motion under advisement. For the reasons set forth below, the Court will **DENY** the relief sought in the Motion.

## II. BACKGROUND[2]

### A. THE MURDER OF CHRISTOPHER MASTERS

On December 14, 2007 at approximately 2:45 a.m., Delaware police responded to the scene of a homicide at 33 Summit Bridge Trailer Park in Newark, Delaware. At the scene, police discovered the body of Christopher Masters. Mr. Masters died from a gunshot wound to the head. Police then learned that another subject had also been shot in connection to the same crime and was at Christiana Hospital for treatment. Police arrived at Christiana Hospital, interviewed the subject that had been shot, and identified him as Jason Slaughter. Mr. Slaughter explained that he and Mr. Masters were hanging out in or about Mr. Master's trailer when two men approached them. According to Mr. Slaughter, the two men attempted to rob them and one of them shot Mr. Masters. Mr. Slaughter also explained that this same man had shot him in the shoulder.

Police continued to investigate the death of Mr. Masters, but charged no one in connection with the death of Mr. Masters. Thereafter, the case became an inactive investigation until June of 2010 when the Georgia Bureau of Investigations ("GBI") contacted Delaware

---

[2] The Court has set out many of the facts discussed here in: *State v. Slaughter*, 2017 WL 87061 (Del. Super. Jan. 10, 2017); *State v. Slaughter*, 152 A.2d 1275 (Del. Super. 2017); *State v. Slaughter*, 2015 WL 9595425 (Del. Super. Dec. 22, 2015).

2

police.

### B. THE MURDER OF MICHAEL HAEGELE

On May 7, 2010, more than two years after the murder of Mr. Masters, police in Georgia found the body of a "John Doe" on the side of the road in Macon County, Georgia. GBI began investigating the death of the "John Doe" and discovered that he had died from a gunshot wound to the back of his head. On May 12, 2010, Mr. Slaughter, who had moved from Delaware to Georgia, and his wife, Donna Slaughter, contacted police and indicated that their roommate, Michael Haegele, was missing and might be the "John Doe." GBI confirmed that the "John Doe" was Mr. Haegele. GBI then searched the home that Mr. Haegele shared with Mr. Slaughter and Donna Slaughter. During the search, GBI discovered three life insurance policies, all issued online from the same company, HSBC. One of the policies was in the amount of $500,000 and listed Mr. Haegele as the insured and Mr. Slaughter as the beneficiary. Based in part on this information, GBI arrested Mr. Slaughter for the murder of Mr. Haegele on May 13, 2010. On May 17, 2010, Donna Slaughter confessed to killing Mr. Haegele and, with Mr. Slaughter's assistance, dumping Mr. Haegele's body in Macon County.

During the investigation, GBI also discovered a life insurance policy in the amount of $250,000 in Mr. Slaughter's Georgia residence. This policy listed Mr. Masters as the insured and Mr. Slaughter as the beneficiary. This prompted GBI to contact Delaware police to inquire about Mr. Masters' death. Thereafter, Delaware police reopened the murder investigation.

The State of Delaware ("Delaware" or the "State") then sought the indictment of Mr. Slaughter on charges related to Mr. Master's death. On July 16, 2012, a New Castle County grand jury indicted Mr. Slaughter on Murder in the First Degree and Possession of a Firearm During the Commission of a Felony in relation to the death of Mr. Masters. At the time

3

Delaware indicted Mr. Slaughter, Mr. Slaughter was already incarcerated and awaiting trial for another murder in the State of Georgia.

The State of Georgia separately tried Mr. Slaughter and Donna Slaughter for the murder of Mr. Haegele. After an extensive trial beginning on October 29, 2012, a jury convicted Donna Slaughter of murder. On August 15, 2013, a different jury convicted Mr. Slaughter of murder and related crimes for Mr. Haegele's death. Mr. Slaughter was sentenced to a life sentence plus thirty years.

## C. MR. SLAUGHTER RETURNS TO DELAWARE.

On or about October 4, 2013, the State lodged a detainer with the Georgia Department of Corrections ("GDOC"). On or about October 15, 2013, GDOC acknowledged the detainer. Mr. Slaughter then requested disposition of the charges underlying the State's detainer pursuant to Section 2542 of the Uniform Agreement on Detainers[3] on or about October 24, 2013. Mr. Slaughter delivered all paperwork required to formalize his request to the warden of GDOC. On or about October 24, 2013, GDOC then sent Mr. Slaughter's request under the UAD to "The Honorable Joseph R. Biden, III, Attorney General's Office, State of Delaware, Wilmington, Delaware." The GDOC, however, did not send Mr. Slaughter's UAD request to the Court. Accompanying the UAD request was Georgia's offer of temporary custody as well as Form VII, Acceptance of Temporary Custody," to be completed by the State and returned to Georgia.

Before the State completed Form VII, however, Delaware advised GDOC that the UAD did not apply to capital murder cases and that Delaware would use a Governor's Warrant to

---

[3] "The Interstate Agreement on Detainers (IAD) is a compact entered into by 48 States, the United States, and the District of Columbia to establish procedures for resolution of one State's outstanding charges against a prisoner of another State." *New York v. Hill*, 528 U.S. 110, 111 (2000); *see also* 18 U.S.C. app. § 2. The Delaware General Assembly codified the IAD, referred to under the statute as the Uniform Agreement on Detainers ("UAD"), in 1969. *See* 11 *Del. C.* §§ 2540–2550. The terms "UAD" and "IAD" will be used interchangeably throughout this opinion, but all citations will be to the UAD statute provisions as "UAD Section ___."

4

procure custody of Mr. Slaughter. GDOC, through a letter, later informed Delaware that Mr. Slaughter had been told that the UAD did not apply and that Delaware would use a Governor's Warrant to extradite him to stand trial in Delaware. The State therefore never completed any forms associated with procuring custody of Mr. Slaughter pursuant to the UAD.

Instead, the State used a Governor's Warrant to obtain temporary custody of Mr. Slaughter and bring him to Delaware. Governor Jack Markell of Delaware signed the Governor's Warrant on July 23, 2014. Governor Nathan Deal of Georgia signed the Governor's Warrant on July 28, 2014. Mr. Slaughter arrived in Delaware at the James T. Vaughn Correctional Center on October 9, 2014.[4]

The Court appointed Patrick Collins, Esquire ("Def. Counsel #1), to represent Mr. Slaughter.[5] On November 18, 2014, the Court held an office conference at which it entered a scheduling order and discussed a date for trial. The Court asked whether the case could be tried within one year of Mr. Slaughter's indictment. Both parties responded that it could not. Def. Counsel #1 then requested a trial date in March or April of 2016. The Court then, without objection from either party, scheduled trial for April 5, 2016. Due to additional scheduling conflicts, Def. Counsel #1 thereafter requested to continue the trial. The Court later rescheduled trial for January 24, 2017.

### D. PRO-TRIAL MOTIONS

On March 31, 2015, Mr. Slaughter filed the First Motion to Dismiss (the "First Motion") the indictment. Mr. Slaughter argued that the UAD applied to his case despite the previous

---

[4] In numerous briefings to the Court, Mr. Slaughter's counsel states that Mr. Slaughter arrived in Delaware on November 18, 2014. Counsel cites to the Superior Court Criminal Docket, which lists November 18, 2014 as the date Mr. Slaughter arrived at the Department of Corrections. This is an error. The Department of Corrections has confirmed that Mr. Slaughter arrived at the James T. Vaughn Correction Center on October 9, 2014.

[5] At the request of Def. Counsel #1, the Court also appointed Natalie Woloshin, Esquire ("Def. Counsel #2"), to represent Mr. Slaughter.

5

representations made by Delaware. Mr. Slaughter claimed that, because the UAD applied, the State failed to timely extradite him from Georgia and try him in this criminal action within the 180-day deadline in UAD Section 2542. The State opposed the First Motion.

The Court held a hearing on the First Motion on July 30, 2015. At the hearing, the State incorrectly represented that after receiving Mr. Slaughter's UAD request, but before the expiration of 180 days, Georgia had informed Delaware that Georgia would not honor the UAD and needed a Governor's Warrant in order to obtain custody of Mr. Slaughter. The State also acknowledged that the information purportedly provided by Georgia — that the UAD does not apply to capital murder cases — was incorrect. It conceded that the UAD does apply to capital murder cases, but the State nonetheless argued against dismissal. The Court asked the State if it knew why Georgia had provided this incorrect information. The State responded that it did not.

Through a detailed oral bench ruling issued at the conclusion of the hearing, the Court denied the First Motion. The Court denied the First Motion for two reasons: "(a) Georgia had notified the State that the IAD did not apply in a capital murder charge and that the State would need to obtain a Governor's Warrant to bring Mr. Slaughter to Delaware, and that Georgia notified the State of this prior to the expiration of the 180-day deadline under the IAD; and (b) that while the State had received notice from Mr. Slaughter under the IAD, the Court, as it must, never received actual notice of Mr. Slaughter's request under the IAD."[6]

Mr. Slaughter filed a Motion for Reargument on August 5, 2015. Mr. Slaughter again argued that the State failed to timely extradite him pursuant to UAD Section 2542. The Court heard arguments from counsel for both Mr. Slaughter and the State. The Court denied the Motion for Reargument on December 22, 2015.[7]

---

[6] Tr. of July 30, 2015 Hr'g 53–69.
[7] *State v. Slaughter*, 2015 WL 9595425 (Del. Super. Dec. 22, 2015).

On January 14, 2016, the Court amended the scheduling order. The Court set a new trial date of January 9, 2017.

Mr. Slaughter filed his Second Motion to Dismiss (the "Second Motion") on August 24, 2016. Mr. Slaughter now made his arguments under UAD Section 2543 instead of UAD Section 2542. In support of the Second Motion, Mr. Slaughter relied on the holding in *United States v. Mauro*[8] to argue that the State failed to bring him to trial within the 120-day time limit enumerated in UAD Section 2543. Mr. Slaughter argued that the State triggered UAD Section 2543 and the 120-day time limit by lodging a detainer and then making a written request for temporary custody via the Governor's Warrant. Prior to filing the Second Motion, both the State and Mr. Slaughter essentially acknowledged that the parties had: (i) not been aware of the *Mauro* decision; (ii) not determined the impact, if any, the *Mauro* decision had on this case; or, (iii) not known whether a detainer and Governor's Warrant could potentially implicate UAD Section 2543.[9] The Court held a hearing on the Second Motion on October 14, 2016.

While the Court had the Second Motion under advisement, the State sent a letter to the Court correcting the misrepresentations made at the July 30, 2015 hearing on the First Motion. The State now disclosed that Ron Mullen, the State's Extradition Supervisor, conveyed to GDOC the concept that the UAD did not apply to Mr. Slaughter's case and that custody of Mr. Slaughter had to be obtained through a Governor's Warrant. The State went on to inform the Court that GDOC only sent the letter memorializing the misinformation after hearing from the State's Extradition Supervisor.

Based on this new information, Mr. Slaughter renewed the First Motion (the "Renewed

---

[8] 436 U.S. 340 (1978).
[9] The State found and presented *Mauro* in a different pending murder case before the President Judge. Mr. Slaughter's counsel is also the defense attorney in that case. Thus, a review of *Mauro* by counsel for Mr. Slaughter prompted the Second Motion.

First Motion"). In the First Motion, Mr. Slaughter had argued under UAD Section 2542 of the UAD and the 180-day requirement. In the Renewed First Motion, Mr. Slaughter argued for dismissal under UAD section 2544. Mr. Slaughter now contended that the State, by misrepresenting the applicability of the UAD and refusing Mr. Slaughter's request for disposition of his charges, refused or failed to accept temporary custody of Mr. Slaughter within the meaning of UAD Section 2544. Therefore, by operation of statute, Mr. Slaughter claimed that the Court must dismiss the present indictment with prejudice.

On September 12, 2016, the State filed a motion *in limine*, under Del. R. Evid. 404(b), seeking to admit eleven prior crimes, wrongs or acts committed by Mr. Slaughter. Mr. Slaughter opposed the motion *in limine* on October 5, 2016. On November 2-3, 2016, the Court held a hearing on the motion in *limine*. At the conclusion of the hearing, the Court ordered supplemental briefing by both parties.

The Court denied the renewed First Motion and the Second Motion on January 3, 2017.[10] The Court reaffirmed its initial ruling on the First Motion, holding that the UAD did not apply because Mr. Slaughter failed to perfect notice with the Court. As for the Second Motion, The Court held that UAD Section 2543 had not been implicated for two reasons. First, Mr. Slaughter waived his right to have his trial within the statutory timeframe because Mr. Slaughter had, within the timeframe, asked for a date outside the timeframe. Second, the Court denied the Second Motion to Dismiss because any failure by the State or Mr. Slaughter to utilize the statutory timeframe was harmless error. [11] Based on the representations made by the parties at the office conference, a trial by March 18, 2015 was highly improbable. The State and Mr.

---

[10] *State v. Slaughter*, 152 A.2d 1275 (Del. Super. 2017).
[11] Def. Counsel #1 incorrectly states that the only basis for the Court's decision on UAD Section 2543 was Def. Counsel's waiver of the 120-day timeframe. Collins Aff. at 3.

Slaughter's counsel noted that this murder trial would require time and extensive preparation.[12] Mr. Slaughter's counsel also informed the Court that he was handling another complex murder trial. Rather than rush to trial, it is likely that counsel for the State or Mr. Slaughter would have instead requested a continuance for "good cause shown" under UAD Section 2543. Alternatively, the Court could have determined on its own that starting the trial by March 18, 2015 could visit prejudice on Mr. Slaughter. Due to the complexity of the case and counsel's scheduling conflicts, the Court would have been well within its discretion in granting a continuance, thereby tolling the 120-day window.

On January 10, 2017, the Court granted, in part, and denied, in part, the State's motion *in limine*.[13] The Court held that two of the ten separate crimes, wrongs or other acts were admissible—the facts and circumstances surrounding the murder of Mr. Haegele and Mr. Slaughter's purchase of an insurance policy for his aunt.

### E. GUILTY PLEA

The State and Mr. Slaughter then entered into a plea agreement. Under the agreement, Mr. Slaughter would plead guilty to Murder Second Degree, and the State agreed to enter a *nolle prosequi* on all other charges and recommend thirty years at Level V suspended after twenty years for ten years at Level IV suspended after six months for two years at Level III. On January 18, 2017, after engaging with the Court in a plea colloquy, Mr. Slaughter pled guilty to Murder Second Degree.[14]

On February 3 and 7, 2017, Mr. Slaughter moved *pro se* to withdraw his guilty plea. The

---

[12] Tr. of Nov. 18, 2014 Office Conference at 4–5.

[13] *State v. Slaughter*, 2017 WL 87061 (Del. Super. Jan. 10, 2017).

[14] According to the affidavits of Def. Counsel #1 and #2, Mr. Slaughter was made aware that if he pled guilty he would be waiving his right to appeal the Court's UAD and motion *in limine* rulings. *See* Collins Aff. at 4-5; Woloshin Aff. at ¶7.

9

Court held a hearing on March 16, 2017, during which Mr. Slaughter claimed that he wanted to represent himself. The Court heard argument and then continued the motion, indicating that the Court wanted to provide additional conflict counsel to Mr. Slaughter. The Court appointed conflict counsel. On May 25, 2017, the Court granted conflict counsel's request to withdraw based on the representation that conflict counsel did not have a good faith basis to ethically argue that Mr. Slaughter did not knowingly, voluntarily and intelligently enter his guilty plea. The Court allowed Mr. Slaughter to proceed *pro se* and, following argument, denied the motion to withdraw the guilty plea.

The Court ordered a pre-sentence investigation. On August 4, 2017, the Court held a hearing on sentencing. After hearing from the parties, the Court sentenced Mr. Slaughter to fifty years at Level V suspended after thirty years at Level V for ten years at Level IV suspended after six months at Level IV for nine years and six months at Level III. The Court ordered Mr. Slaughter's sentence to run consecutively with his sentence in Georgia.

Mr. Slaughter did not directly appeal his conviction or sentence.

### III.    THE MOTION

Mr. Slaughter makes three claims for relief in the Motion. Mr. Slaughter contends that: (i) Def. Counsel #1 failed to provide him with effective representation by waiving his rights under the UAD by agreeing to a trial date outside the 120-day time limit set out in UAD Section 2543; (ii) Mr. Slaughter's extradition from Georgia to Delaware and failure to try him within 120-days violated his rights under the UAD; and (iii) Def. Counsel #1 and #2 were ineffective for failing to file a direct appeal challenging the Court's ruling on the Second Motion.

The State opposes the Motion. The State contends that Mr. Slaughter waived each of his claims by pleading guilty. In addition, the State argues that Mr. Slaughter's attorneys were not

10

ineffective for waiving his rights under UAD Section 2543, or for not appealing the Court's decision on the Second Motion.

## IV.   LEGAL STANDARD

Before addressing the merits of a Rule 61 motion for postconviction relief, the Court must first determine whether Mr. Slaughter has satisfied the procedural requirements of Rule 61.[15] Rule 61(i) establishes four procedural bars to postconviction relief: (1) a motion for postconviction relief may not be filed more than one year after the judgment of conviction is final; (2) any ground for relief not asserted in a prior postconviction proceeding is barred; (3) any ground for relief not asserted in the proceedings leading to the judgment of conviction is barred; and (4) any ground for relief previously adjudicated in any proceeding is barred.[16]

The procedural bars contained in Rule 61(i)(1)-(4) may be rescinded only if there is a means by which to do so in the applicable subsection of Rule 61.[17] Absent such relief, Rule 61(i)(5) provides additional reprieve from the procedural bars described in Rule 61(i)(1)-(3).[18] Under Rule 61(i)(5), "[t]he bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule."[19] The subparts in Rule 61(d)(2) require that a movant:

   (i)     pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or

   (ii)    pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court

---

[15] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[16] Super. Ct. Crim. R. 61(i).
[17] *State v. MacDonald,* 2007 WL 1378332, *4 (Del. Super. May 9, 2007).
[18] *Id.*
[19] Super. Ct. Crim. R. 61(i)(5).

11

or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.[20]

The Court finds that the Mr. Slaughter contentions regarding ineffective representation by Trial Counsel are not procedurally barred under Rule 61(i)(1-4). As discussed below, the Court does find the Motion's contention regarding the violation of his rights under the UAD to be procedurally barred under Rule 61(i)(3).

## V. DISCUSSION

### A. MR. SLAUGHTER'S ARGUMENTS REGARDING THE UAD ARE PROCEDURALLY BARRED.

Under Rule 61(i)(3), a claim not asserted in the proceedings leading to the judgment of conviction is procedurally barred. Claims regarding UAD are the types of claims that should be raised during the direct appeal process.[21] If raised for the first time in a Rule 61 motion, a defendant must show that: (i) "some external impediment" prevented him from raising the claim on direct appeal and (ii) he was prejudiced in that the outcome would have changed had the issue been raised before.[22]

The Court finds that any of Mr. Slaughter's arguments regarding the Court's rulings on the application of the UAD are barred. The Court ruled on the First Motion, a motion seeking reargument of the First Motion, the Second Motion and a renewed First Motion. Mr. Slaughter did not take a direct appeal of any of those rulings. Moreover, Mr. Slaughter has not demonstrated any external impediment that prevented him from raising these arguments on any direct appeal he could have taken. The Court will not readdress those rulings except as they might relate to the claims of ineffective assistance of counsel.

---

[20] Super. Ct. Crim. R. 61(d)(2).
[21] *See State v. Reyes*, 155 A.3d 331 (Del. 2017); *see also Alexander v. State,* 2008 WL 4809624 (Del. Nov. 5, 2008); Benner v. State, 2007 WL 4215005 (Del. Nov. 30, 2007).
[22] Super. Ct. Crim. Rule 61(i)(3)(A); *see also Younger*, 580 A.2d at 556; *Flamer v. State*, 585 A.2d 736, 748 (Del. 1990).

12

## B. MR. SLAUGHTER WAIVED HIS CLAIMS BY PLEADING GUILTY.

The Court holds that Mr. Slaughter waived his claims regarding the UAD and ineffective assistance of counsel by pleading guilty. The Court notes that Mr. Slaughter now complains about issues that were openly raised and addressed by the Court on several occasions before Mr. Slaughter pled guilty. Def. Counsel #1 discussed the failure to invoke UAD Section 2543 in open court. The Court addressed that issue in written decision prior to Mr. Slaughter pleading guilty. [23] Def. Counsel #1 and Defense #2 discussed waiver with Mr. Slaughter prior to his guilty plea.[24] Mr. Slaughter was aware of all this and still pled guilty. The Court even appointed additional defense counsel when Mr. Slaughter moved to withdraw the guilty plea. After hearing from this counsel, the Court considered the motion to withdraw the guilty plea and found it to be knowing, intelligent and voluntary.

*Alexander v. State*[25] controls here. In *Alexander*, the defendant was charged with three counts of Rape First Degree. The defendant pled *nolo contendre* to one count of Rape Third Degree prior to trial. The defendant thereafter moved under Rule 61, contending that his extradition from Pennsylvania to Delaware violated the UAD. In addition, the defendant argued that his trial counsel had been ineffective in failing to move to dismiss the indictment on the basis of the UAD error that resulted in a violation of his speedy trial rights. This Court summarily dismissed the Criminal Rule 61 motion.[26] The Supreme Court affirmed the summary dismissal.[27] The Supreme Court stated that a valid guilty plea acts as a waiver to any postconviction claims of relief of any alleged errors or defects that happened before the entry of

---

[23] *State v. Slaughter*, 152 A.2d 1275 (Del. Super. 2017).
[24] *See* Collins Aff. at 4-5; Woloshin Aff. at ¶7.
[25] 2008 WL 4809624 (Del. Nov. 5, 2008).
[26] *Id*. at *1.
[27] *Id*.

the plea, and that "[b]ecause [defendant's] claim of improprieties under the [UAD] implicates alleged errors or defects occurring prior to the entry of his plea," the claim was waived.[28] As such, the defendant's claims regarding the UAD *and* ineffective assistance of counsel relating to UAD claim were procedurally barred.[29]

As discussed at length above, the Court openly addressed Mr. Slaughter's rights under the UAD. The Court discussed claims regarding ineffective waiver and even any potential ineffective assistance of counsel. Mr. Slaughter pled guilty. The Court twice found the guilty plea to be knowing, intelligent and voluntary. Under these circumstances, the Court holds that Mr. Slaughter waived his claims under the UAD and to effective assistance of counsel by pleading guilty.[30]

## C. ALTERNATIVELY, MR. SLAUGHTER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS FAIL UNDER THE *STRICKLAND* ANALYSIS.

Mr. Slaughter asserts a number of ineffective assistance of counsel claims. The standard used to evaluate a claim of ineffective assistance of counsel is the two-pronged test articulated by the United States Supreme Court in *Strickland v. Washington*,[31] and adopted by the Delaware Supreme Court in *Albury v. State*.[32] Under *Strickland*, the defendant "must establish both (1) deficient performance by trial counsel and (2) prejudice suffered as a result of the deficient performance."[33] Failure to establish either prong of the test will result in a denial of the defendant's claim for relief.[34]

---

[28] *Id.*

[29] *Id.*

[30] *Id.*; *see also Benner v. State*, 2007 WL 4215005 (Del. Nov. 30, 2007) (finding that voluntary guilty plea waived claims that time limit under UAD was violated).

[31] 466 U.S. 668, 687 (1984)

[32] *State v. Sykes*, 2014 WL 619503 *12 (Del. Super. Jan 21, 2014) (citing *Flamer v. State*, 585 A.2d 736, 754 (Del. 1990)); *State v. Gattis,* 1995 WL 790961, at *3 (Del. Super. Dec. 28, 1995).

[33] *Id.* (citing *Strickland*, 466 U.S. at 687).

[34] *Id.* (citing *Strickland*, 466 U.S. at 697).

14

In order to satisfy the first prong of the *Strickland* test, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness.[35] There is no exact standard used to determine reasonably effective assistance of counsel, rather, performance is measured under prevailing professional norms.[36] "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."[37] In *Strickland*, the United States Supreme Court recognized that there is more than one way for counsel to provide effective assistance in any given case, noting that equally competent attorneys may tactically approach the same case in a different manner.[38] Moreover, the movant must overcome a strong presumption that counsel's performance was within the "wide range of reasonable professional assistance."[39]

The second prong of the *Strickland* test requires that the defendant prove that it is reasonably probable that, but for the mistakes of counsel, "the fact finder would have had a reasonable doubt respecting guilt."[40] In *Strickland*, the United States Supreme Court defined reasonable probability as "a probability sufficient to undermine confidence in the outcome."[41] In determining whether the defendant suffered prejudice as a result of ineffective assistance of counsel, the Court must consider the "totality of the evidence before the judge or jury."[42] The showing of prejudice is essential to a claim of ineffective assistance of counsel, and thus, the court in *Strickland* stated "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[43]

---

[35] *Strickland*, 466 U.S. at 688.
[36] *Sykes*, 2014 WL 619503, at *13 (citing *Strickland*, 466 U.S. at 688).
[37] *Strickland*, 466 U.S. at 688.
[38] *Id.* at 689.
[39] *Gattis*, 1995 WL 790961, at *4 (citing *Strickland*, 466 U.S. at 689).
[40] *Strickland*, 466 U.S. at 695.
[41] *Id.* at 694.
[42] *Id.* at 695.
[43] *Id.* at 697.

Furthermore, "[i]f the defendant fails to 'state with particularity the nature of the prejudice experienced,' such failure is 'fatal to a claim of ineffective assistance of counsel.'"[44]

The Court finds Mr. Slaughter's ineffective assistance of counsel claims lack merit. The Court recognizes that Def. Counsel #1 believes he did not provide effective assistance of counsel on Mr. Slaughter's UAD Section 2543 right; however, that is not determinative here. The Court held that even if Def. Counsel #1 would have made a trial request under UAD Section 2543, the Court could have determined on its own that starting the trial by March 18, 2015 could visit prejudice on Mr. Slaughter. Due to the complexity of the case and counsel's scheduling conflicts, the Court would have been well within its discretion to grant a continuance or continue trial on its own and toll the 120-day window. Mr. Slaughter's case was initially indicted as a capital case. The case involved a very fact intensive motion *in limine*. The Court would never have "raced" this case to trial. Even if Def. Counsel #1's representation fell below some objective standard of reasonableness, Mr. Slaughter cannot show prejudice.

Mr. Slaughter's argument that Def. Counsel #2 was ineffective is also meritless. First, Def. Counsel #2 states that, prior to pleading guilty, Mr. Slaughter was informed that he could not appeal the Court's previous rulings if he pled guilty. Second, any appeal on the UAD rulings would have been fruitless because Mr. Slaughter pled guilty and, therefore, waived the ability to appeals those rulings. Accordingly, Mr. Slaughter's ineffective assistance of counsel arguments fail under both prongs of *Strickland*.

---

[44] *Sykes*, 2014 WL 619503, at *13 (citing *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996)).

## VI.    CONCLUSION

Accordingly, for the reasons stated above, Mr. Slaughter's Rule 61 Motion is **DENIED.**

**IT IS SO ORDERED.**

/s/ Eric M. Davis
Eric M. Davis, Judge

cc:    Original to Prothonotary

17